UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

PRIME FINANCIAL SERVICES, LLC,

      Plaintiff,

                                     Case No. 1:04-CV-414

v.

                                     HON. GORDON J. QUIST

BANK ONE, NA

      Defendant.
_____/

## OPINION

        Prime Financial Services, LLC, ("Prime Financial"), whose sole member, Arthur Bott, is a resident of Michigan, filed a three count complaint against Bank One, a National Banking Association headquartered in Illinois, alleging that Bank One made two unauthorized transfers of funds, one for $630,000 and the other for $5,000, from Prime Financial's Bank One checking account.[1]  Prime Financial asserts that because these transfers were unauthorized, Article 4A of the Uniform Commercial Code ("UCC"), codified in Michigan as M.C.L. §§ 440.4601 - .4957, entitles it to a refund from Bank One of $635,000 plus interest as of the date of the unauthorized transfers. Prime Financial also alleges that these unauthorized transfers constituted common law conversion. Prime Financial has moved for summary judgment on its Article 4A UCC claims.  Prime Financial asserts that it is entitled to summary judgment on its Article 4A UCC claims because, it contends, even when viewing the evidence in the light most favorable to Bank One, no reasonable trier of fact could conclude that Prime Financial authorized the transfers.

---

[1] Because Bank One is a national banking association, 28 U.S.C. § 1348 applies in determining where Bank One is "located" for purposes of diversity jurisdiction.  In *Wachovia, N.A. v. Schmidt*, No. 04-1186, 2006 WL 89196 (U.S. Jan. 17, 2006), the Supreme Court held that, for purposes of § 1348, a national bank is not "located" in any state in which it operates a branch, but rather is located only where its "main office" is located.  At the time this case was removed to federal court, Bank One's main office was located in Illinois.  Thus, since complete diversity exists between Prime Financial and Bank One, and since the amount in controversy exceeds $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## I. Facts

### A.   Prime Financial

Arthur Bott formed Prime Financial Services, LLC, "for the purpose of lending money." (Bott Dep. at 6.)   The entity to which Prime Financial primarily loaned money was Pupler Distributing Company ("Pupler"), a d/b/a of Daniel Broucek.   Arthur Bott first met Daniel Broucek in July 2002, when Paolo Scalici, Arthur Bott's neighbor, introduced Bott to Broucek.   (*Id*. at 10.) Broucek told Bott that he was in the business of buying oversupplied merchandise and then selling that merchandise for a profit. (*Id*. at 10-11.) To finance this operation, Broucek accepted loans from investors in exchange for a promissory note and a post-dated check for the principal of the loan plus a substantial "financing fee."   Although Bott has characterized these financing fees as "shared profits" from Broucek's operation, he admits the financing fees were always recorded as interest. (*Id*. at 78.)  In making these loans to Pupler, Arthur Bott dealt through Paolo Scalici, rather than Broucek, because, Bott testified, Broucek "was extremely busy buying and selling merchandise." (*Id*. at 11.)

Prime Financial opened a checking account with Bank One at its branch on 44th Street and Division in Grand Rapids, Michigan, on August 9, 2002.  Bott testified that the purpose of opening this account at Bank One was because Pupler's checking account was located at Bank One.  (*Id*. at 19.)  This way, since Pupler and Prime Financial would have their accounts at the same bank, Pupler's checks drawn on its Bank One account to Prime Financial would clear the same day Prime Financial deposited them into its Bank One account, as Bank One would be both the depositary bank and the drawee bank.  (*Id*.)

### B.   The $630,000 Miscellaneous Charge

On October 7, 2002, in exchange for a loan of $600,000, Arthur Bott received a note from Pupler promising to pay Arthur Bott "the sum of $630,000, which includes a financing fee of

$30,000" by October 21, 2002. (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. N.) At the same time

he received this note, Bott received a post-dated check from Pupler dated October 21, 2002. On

October 17, 2002, Arthur Bott deposited the check dated October 21, 2002, from Pupler into Prime

Financial's account. (Bott Dep. at 82.) Bott testified that Broucek called and told him that the check

dated October 21, 2002, was good, and that, since Bott had been a good customer, he could go ahead

and deposit it early. (*Id.* at 83-84.) The deposit slip for the check dated October 21, 2002, was itself

dated October 21, 2002. (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. I.) However, the deposit slip

is stamped October 17, 2002, 10:33 a.m., and the bank records indicate that a check for $630,000

was deposited on October 17, 2002. (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. I. and Br. Supp.

Pl.'s Mot. Partial Summ. J. Ex. 3.) Bott testified that his handwriting was on the deposit slip. (Bott

dep. at 81.)

On October 18, 2002, $630,000 was debited from Prime Financial's Bank One account. This

debit was recorded as a "miscellaneous charge" on Prime Financial's bank statement. (Br. Supp.

Pl.'s Mot. Partial Summ. J. Ex. 3.) Teddi McEachern, the Assistant Banking Center Manager at the

Bank One branch on 44th Street and Division, testified that she processed this transaction per Arthur

Bott's request (McEachern Dep. at 32.) Specifically, she testified that on October 18, 2002, Bott

came to the customer service station seeking assistance. (*Id.* at 48.) McEachern offered to help him

and took him to Venus Snarski's office. (*Id.* at 54.) McEachern explained that she could not take

Bott back to her office because it was behind the teller line, and customers are not permitted behind

the teller line. (*Id.* at 55.) McEachern testified that Bott, who "was quite upset," indicated to her that

he had a left a post-dated check at the bank to be deposited on the date the check became due, but

that, despite these instructions, someone at the banking center deposited the check early. (*Id.* at 32.)

McEachern testified that Bott requested that this transaction be cancelled, as he "was concerned that

there would be repercussions from Pupler for negotiating the check early." (*Id.*) McEachern

informed him that she could not cancel this transaction, in the sense of making it "disappear," (*id.* at 38), but that she could reverse the transaction. (*Id.* at 32, 38.) Bott stated that he wanted to do that. (*Id.* at 38.) McEachern then prepared a debit form and a credit form to debit $630,000 from Bott's account and to credit that amount to Pupler's account. McEachern testified that she filled out the debit slip based on what Bott related to her, (*id.* at 110.), and that she gave him a copy of the debit form after she completed it. (*Id.* at 60.) The debit form that McEachern filled out reads, "[r]eversing dep[osit] made in error on 10/15 per Mr. Bott['s] request." (Br. Supp. Pl.'s Mot. Partial Summ. J. Ex. 5.) The debit form was dated 10-18-02, and lists $630,000 as the amount to be debited. Moreover, the debit form is stamped "10/18/2002 11:12 a.m."[2] (*Id.*) Prime Financial's bank statement indicates that, in addition to the $630,000 check deposited in its account on October 17, 2002, another $630,000 check was deposited into Prime Financial's account on October 15, 2002.[3] (*Id.* at Ex. 3.) The check deposited October 15th, which also came from Pupler, was dated October 14, 2002. (*Id.* at Ex. 10.) McEachern testified that she does not recall whether she attempted to confirm that a post-dated check was deposited on October 15th. (McEachern Dep. at 110-111.) McEachern explained that she probably looked at the computer, as that is what she normally would

---

[2] McEachern testified that, after filling out the debit slip, she did not proceed immediately to the teller to process the transaction. Rather, since transactions would go on throughout the day, she would make stops at the teller line and process transactions in bulk. (McEachern Dep. at 68-69.)

[3] The two $630,000 checks that Bott received from Pupler constituted the returns on two $600,000 loans Bott made to Pupler. The first $600,000 loan was made on September 27, 2002. (Bott dep. at 61) (Def.'s App. Opp'n Mot. Partial Summ. J. at Ex. B.) On October 7, 2002, in payment for the September 27th loan, Bott deposited a check from Pupler in the amount of $624,000 ($600,000 in principal plus $24,000 in interest). (Def.'s App. Opp'n Mot. Partial Summ. J. at Ex. B.) (Br. Supp. Pl.'s Mot. Partial Summ. J at Ex. 3.) On October 7, 2002, Bott also re-invested $600,000 in Pupler, and, in exchange, received a promissory note plus a check dated October 21, 2002, in the amount of $630,000. (*Id.*) This check deposited on October 17, 2002.

The second $600,000 loan to Pupler was made on September 30, 2002. (Bott dep. at 63.) (Def.'s App. Opp'n Mot. Partial Summ. J. at Ex. B.) (Br. Supp. Pl.'s Mot. Partial Summ. J at Ex. 3.) On October 15, 2002, in payment for the September 30, 2002 loan, Bott deposited a check from Pupler in the amount of $630,000 ($600,000 in principal plus $30,000 in interest). (*Id.*) On October 15, 2002, Bott also re-invested $630,000 in Pupler. (*Id.*) On October 31, 2002, in payment for the loan made on October 15, 2002, Bott received a check from Pupler in the amount of $661,600 ($630,000 in principal plus $31,500 in interest). Finally, also on October 31st, Bott re-invested $500,000 into Pupler.

have done, but does not recall what documents she would have been able to see on the computer (e.g., simply a transaction entry or a scanned check).  (*Id*. at 37-38, 110-11.)

Bott testified that he never authorized the October 18, 2002, "miscellaneous charge" either orally or in writing.  (Bott Aff. ¶ 3.)  Bott explained that he first learned of this "miscellaneous charge" in early November when he received his October statement.  (Bott dep. at 38.)  Terrence Roach, a Bank One employee, testified that Bott came to the bank in early November and told him that he (Bott) wanted to file a claim because he had not authorized the October 18, 2002, "miscellaneous charge" transaction that appeared in his October statement.  (Roach dep. at 39.) Roach testified that Bott claimed that "he was sure that he had not given authorization for that [transaction] because he was positive he was not in the branch [on October 18, 2002]."  (*Id.*)  During his deposition, Bott admitted that he was in the bank on October 18, 2002.  (Bott Dep. 32.)  Bott testified that, while at the Bank, he deposited a $210,000 check from Pupler into an account in the name of the Arthur J Bott Sr. Foundation, Inc.[4]  (*Id*. at 68.)  The deposit slip indicates that this transaction was processed at 10:14 a.m.  (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. N.)  Bott testified that he then went to the customer service area and requested to see Venus Snarski, a bank employee whom he used in processing transactions involving the Foundation account.  (*Id*. at 49-50.) Bott testified that he had to wait for her as she was on the phone.  (*Id*. at 50.)  After she got off the phone, they went into her office where he handed her a check in the amount of $210,000 drawn on his Foundation account in favor of Pupler for purposes of re-investment.  (*Id*. at 68.)  He instructed her to make sure that the check he deposited from Pupler into the Foundation account cleared before she deposited his check into Pupler, for otherwise the check drawn on the Foundation account for re-investment into Pupler would bounce.  (*Id*. at 68-9.)  This $210,000 re-investment check was

---

[4] In addition to using Prime Financial as a source of loans to Pupler, Bott also used his Foundation account as a source of funds to loan Pupler.

deposited at 4:31 p.m. on October 18th. (Pl.'s Reply Def.'s Br. Opp'n Pl.'s Mot. Summ. J. at Ex. 4.) Venus Snarski, for her part, testified that she did not work at the bank on October 18, 2002. (Snarski Dep. at 79.) She explained that she was having stomach pains the morning of the 18th, and that her doctor instructed her to go to the emergency room, which she did. (*Id*.); (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. S.) Finally, on October 18, 2002, after Bott claimed to have handed the $210,000 check to Venus Snarski, he testified that he left the bank and drove directly home. (Bott Dep. at 126.) Bott explained that the drive to the bank from his home took about half an hour (*Id*.) After getting home from the bank, Paolo Scalici dropped by Bott's house around 11:30 a.m., told Bott that he was going to the bank, and asked if Bott had a deposit he could drop off for him. (*Id*. at 113.) Bott told Scalici that he did not. (*Id*. at 114.) Bank records indicate that Scalici deposited a check at the bank on October 18 at 1:12 p.m. (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. DD.)

## C.     The $5,000 Transfer

Two weeks later, on November 1, 2002, Paolo Scalici again went over to Bott's home, told Bott that he was going to the bank, and asked Bott if he had a deposit he could drop off for him. (Bott Dep. at 71.) Bott told him that he did and gave him a check for $5,250 from Stonetech Marble & Granite, Inc., a company to which Bott had loaned money through Prime Financial, and a deposit slip. (*Id*.) From the stamped deposit slip, it appears that Scalici deposited this check into Prime Financial's account at 1:31 p.m.[5] (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. V.) Also on November 1st, $5,000 was transferred from Prime Financial's account to Pupler's account. (*Id*. at Ex. U.) This transaction was processed at 1:39 p.m. (*Id*.) Amy Okoroafo, the bank's manager, processed this transaction. (*Id*.); (Okoroafo Dep. at 90.) Okoroafo testified that she did not recall

---

[5] The time this check was deposited is indicated on the back of the deposit slip. It is clear that the deposit slip is stamped "11/01/2002" and it is also clear that it was deposited within the 1:00 p.m. hour on that day. However, the minute in which the deposit was made is not entirely clear on the exhibit provided to the Court.

the specifics as to what caused her to transfer $5,000 from Prime Financial's account to Pupler's account.  (Okoroafo Dep. at 90.)  She testified that although the user note says "per Art," she does not recall if she talked to Arthur Bott.  (*Id.*)  She admitted that it was possible that she talked with Paolo Scalici in connection with this transfer.  (*Id.* at 91.)

**D.  Paolo Scalici**

On November 4th or 5th, 2002, Bank One froze Pupler's account because of the account's "unusual activity."  (Roach Dep. 27-29.)  Later, it was discovered that Pupler had not been in the business of buying and selling merchandise, but rather was a "Ponzi" scheme, whereby Pupler used funds raised by later investors to pay amounts due to former investors.  *See Wellman*, No. 253996, 2005 WL 2291741 (Mich. Ct. App. Sept. 20, 2005) (describing the operation of Pupler's "Ponzi" scheme).  Bott testified that after Pupler's account was frozen and after he received his October statement, Scalici called him over to his house.  (Bott Dep. at 123.)  Bott testified that Scalici told him that he (Scalici) knew, as a consequence of Bott having deposited on 10/17 the $630,000 check dated 10/21 from Pupler, that Bott had $630,000 in his account.  (*Id.* at 73.)  Bott claims that Scalici told him that since the $630,000 was not gaining any interest in Prime Financial's account, he transferred the money into Pupler's account as an investment for Bott.  (*Id.* at 77, 123.)  Bott testified that Scalici told him that he also transferred $5,000 from Prime Financial's account to Pupler's account as an investment, since that money, similarly, was not earning interest in Prime Financial's account.[6]  (*Id.* at 122.)  Finally, Bott claims that Scalici handed him a promissory note dated October

---

[6] Venus Snarski testified that Scalici had the authority, as approved by Amy Okoroafo, to do the following: Scalici would come into the bank with a check drawn on Pupler's account made payable to a bank customer's account.  (Venus Dep. at 36.)  The bank would deposit the check into the customer's account, and then it would process a miscellaneous debit pulling out the principal of the check the bank just deposited into the customer's account and turn it into a check made payable to Pupler for reinvestment.  (*Id.* at 37.)

Okoroafo also testified that Scalici would come into the bank with a check drawn on Pupler's account made payable to a customer of the bank, which she would deposit, and then, per Scalici's request, transfer money out of the customer's account into Pupler for the customer's reinvestment.  (Okoroafo Dep. at 91.)

21st from Pupler promising to pay Bott $661,500 "on or before November 7, 2002," in exchange for a loan of $630,000 (which was the amount owed to Bott on 10/21 as evidenced by the 10/07 promissory note Bott received). (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. N.)  The note provides that it was "[e]xecuted this 21st day of October, 2002." (*Id.*)  It is signed by Daniel Broucek. (*Id.*)

## II.  Analysis

### A.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*  The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### B.    Applicable Law

The parties agree that UCC Article 4A, codified in Michigan as M.C.L. §§ 440.4601-.4957, governs this case.  Article 4A applies to "funds transfers." M.C.L. § 440.4602.  A fund transfer is defined as a transaction, "beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. "  M.C.L. § 440.4604.  In this case, Bank One transferred funds from Prime Financial's account to Pupler's account purportedly on Prime Financial's order.  Article 4A provides:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is . . . not authorized and not effective as the order of the customer under section [440.4702] . . . the bank shall refund any payment of the payment order

8

received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

M.C.L. § 440.4704(1). Section 440.4702 provides that "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency." Finally, § 440.4603(1)(a) defines "payment order," as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay . . . a fixed or determinable amount of money to a beneficiary . . . .".

### C.    The October 18th $630,000 Miscellaneous Charge

Prime Financial offers a number of arguments in support of its position that no reasonable trier of fact could conclude that it authorized the October 18th $630,000 transfer. Primarily, it argues that Bank One's account as to what happened on October 18th, namely, that Arthur Bott requested Terri McEachern to reverse the deposit of a post-dated check, is "flatly contradicted by the documents [Bank One] prepared contemporaneous with processing" the transaction. (Br. Supp. Mot. Partial Summ. J. at 3.) The debit form McEachern filled out to process this transaction reads, "reversing dep[osit] made in error on 10/15 per Mr. Bott['s] request." (*Id*. at Ex. 5.) Prime Financial notes that the check that was deposited into its account on 10/15 was dated 10/14, and thus was not a post-dated check. "This contradiction" (McEachern's testimony that Arthur Bott requested the reversal of a post-dated check and the note on the debit slip referring to a check that was not post-dated), Prime Financial contends, "is an impenetrable barrier to any trier of fact concluding" that Prime Financial authorized the transaction. (*Id*. at 3.)

The Court disagrees, for, when viewing the evidence in light most favorable to Bank One, this "contradiction" would not lead a reasonable juror to necessarily conclude that Bott did not authorize this transaction. McEachern testified that she prepared the debit slip based upon what Bott related to her. (McEachern Dep. at 110.) Thus, if Bott relayed the date to her, he may have relayed

the incorrect date. On the other hand, if Bott relayed the correct date to her, the notation of 10/15 might simply have been a scrivener's error. A third possibility is that Bott never told her the date. McEachern testified that she could not remember whether she checked if a post-dated check was deposited on 10/15. She explained, however, that she probably looked at the computer, as that is what she normally would have done. If Bott had told her that a post-dated check for $630,000 was deposited early without informing her of the date it was deposited, and if McEachern looked at the computer, she would have seen that a $630,000 transaction was processed on 10/15. Therefore, if Bott told her only that a check for $630,000 was deposited early, and that he wanted this transaction reversed, McEachern may simply have concluded that the $630,000 transaction on 10/15 was the $630,000 transaction that Bott was requesting to be reversed. Although a reasonable juror could conclude, in light of the 10/15 notation on the deposit slip, that Bank One's assertion that Bott requested the reversal of a post-dated check is incredible, ultimately, it is for the jury to decide whose explanation for the existence of the 10/15 notation on the debit slip it finds more persuasive.

The notation of 10/15 on the debit slip, moreover, cannot be viewed in isolation from the other evidence presented in this case. For instance, although the basis for Prime Financial's argument that the 10/15 notation on the debit slip is an "impenetrable barrier" to any trier of fact concluding that it authorized the 10/18 miscellaneous charge must be that McEachern's testimony that Bott authorized the transaction is incredible, Arthur Bott's credibility has not gone unscathed. First, Terrence Roach testified that Bott claimed that "he was sure that he had not given authorization for" the October 18th transaction "because he was positive he was not in the branch that day." (Roach Dep. at 39.) Although Bott later admitted that he had been in the bank on October 18th, he testified that, besides depositing a check from Pupler into his Arthur J. Bott Sr. Foundation account, the only other thing he did at the bank that morning was to meet with and hand a check drawn on his Foundation account in favor of Pupler to Venus Snarksi. Snarski testified, however, that she was

not at work on October 18th, as she had gone to the emergency room due to stomach pains.[7]
Questions of credibility, the Sixth Circuit has explained, lie within "the peculiar province of the
jury." *Murray Hill Publ'n Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 321 (6th Cir.
2004).

Additionally, Bank One has presented evidence consistent with its theory that Bott, and not
Scalici, requested that Bank One transfer $630,000 from Prime Financial's account to Pupler's
account on October 18th. The record indicates that Bott deposited a $210,000 check into his
Foundation account at 10:14 a.m. The record also indicates that the $630,000 miscellaneous charge
was processed at 11:12 a.m. This time frame is consistent with McEachern's testimony that, after
filling out the debit slip as requested by Bott, she did not immediately process the transaction, but
rather would process transactions in bulk throughout the day. Moreover, this evidence could
reasonably be viewed as inconsistent with Bott's testimony that Scalici requested the bank to transfer
$630,000 from Prime Financial to Pupler. Bott testified that Scalici came over to his house around
11:30 a.m. on the morning of the 18th and told Bott that he was going to the bank. Bank records
indicate that Scalici deposited a check at the bank on October 18th at 1:12 p.m., which is two hours
after the $630,000 miscellaneous charge was processed.

Prime Financial also argues that, if as Bank One contends, the $630,000 miscellaneous
charge was to reverse the deposit into Prime Financial's account of a post-dated check, this check
should have been returned to Bott for re-deposit or the amount re-credited when the check became
due. The fact that the check was never returned to Bott, or the amount of the check never re-credited
to Prime Financial when the instrument became due, Prime Financial argues, makes it more likely
that there was never a request to reverse the deposit of the check.

---

[7] Furthermore, upon viewing bank security photos from October 18th, which showed Bott at the customer
service station, McEachern testified that, although she could not determine it with complete certainty, she believed that
the photos depicted the bottom portion of her body as she approached to assist Bott. (McEachern Dep. at 88-89.)

This argument does not persuade the Court that Prime Financial is entitled to summary judgment. First, it ignores McEachern's testimony. McEachern testified that she encouraged Bott to leave the situation involving the deposit of the post-dated check as it was because the check became properly payable in two days. (McEachern Dep. at 39.) McEachern explained that Bott responded that this option was not acceptable to him. She further testified that she told Bott that she could not reverse the deposit, in the sense of making it disappear, as Pupler's account would have already been debited the amount of the check and Prime Financial's account already credited. (*Id.* at 32.) Instead, she explained that she could reverse the transaction by debiting Prime Financial's account and crediting Pupler's account. (*Id.*) Prime Financial has not shown that this was an improper course of conduct. But even if it were, this is irrelevant to the question of whether Bott authorized McEachern to process this transaction. That is, even if she were able to and should have reversed the deposit of the post-dated check by somehow pulling it and handing it back to Bott, if Bott requested that she process this transaction, the transaction would have been authorized despite her (allegedly) improper course of conduct.[8]

Finally, Prime Financial argues that Bank One's policies and procedures prohibited McEachern from processing this transaction without obtaining written authorization. The existence of the bank's policy requiring written authorization coupled with the absence of such written proof, Prime Financial concludes, "seals the credibility of the sworn testimony of Prime that no authorization was provided to the Bank." (Pl.'s Reply Def.'s Br. Opp'n Pl.'s Mot. Partial Summ.

---

[8] The Court notes that Bott's failure to receive a check from Pupler on 10/21 after the $630,000 was transferred from Prime Financial to Pupler on October 18th could be viewed as consistent with the subsequent demise of Pupler. Once the $630,000 was transferred back to Pupler, Pupler would then still have owed Prime Financial $630,000 as of 10/21, as evidenced by the 10/7 promissory note. Rather than receiving a check, Bott received a promissory note, dated 10/21, promising to pay Bott $630,000 in principal plus a $31,500 "financing fee" as of 11/07. That is, the amount owed as of 10/21 became the principal for another loan. It is reasonable that, rather than issuing Prime Financial a check, Pupler would have issued Prime Financial a promissory note, since, as everyone is now aware, Pupler was on the brink of collapse at the end of October 2002. Bott testified, however, that he did not receive the 10/21 promissory note until after Pupler had already collapsed. (Bott Dep. at 122.) Nonetheless, if a reasonable trier of fact could believe that he authorized the 10/18 "miscellaneous charge" despite his testimony to the contrary, then a reasonable trier of fact could also believe that he received the 10/21 promissory note on 10/21, despite his testimony to the contrary.

J. at 3.)  McEachern testified that there was no place on the debit slip she filled out for the originator's signature.  (McEachern Dep. at 59.)  She also testified that she did not know of a policy that required her to obtain a signature.  (*Id.*)  Even if she had been required to obtain Bott's signature, moreover, that would merely indicate that she violated an internal bank procedure of which she was apparently unaware, and would not, as Prime Financial contends, necessarily "seal the credibility" of Bott that he did not authorize the transaction.

To the extent that Prime Financial argues that the $630,000 transaction was unauthorized for purposes of Article 4A because McEachern did not obtain written authorization as allegedly required by the bank's policies, such an argument is without merit.  Article 4A defines a fund transfer as a transaction "beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order," and a "payment order" as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing . . . ."  Prime Financial does not argue, and presents no authority to show, that the bank's internal procedures and policies, allegedly requiring written authorization, pre-empt the governing provisions under Article 4A, which permit a payment order to be made orally.

Because, in viewing the evidence in the light most favorable to Bank One, a reasonable trier of fact could conclude that Bott authorized the $630,000 transaction, the Court will deny Prime Financial's motion for summary judgment that the $630,000 transfer on October 18th was unauthorized.

**D.    The $5,000 Transaction**

It is undisputed that there was no written authorization for the $5,000 transfer on November 1, 2002, from Prime Financial's account to Pupler's account.  Bott testified that he did not orally authorize this transfer.  (Bott Aff. ¶ 4.)  Prime Financial argues that it is entitled to summary judgment on this claim because Bank One "is unable to produce credible evidence to refute sworn

13

testimony that this transfer was unauthorized."  (Br. Supp. Pl.'s Mot. Partial Summ. J. at 13.)

Although the "user notes" for the $5,000 transaction indicate "per Art," Okoroafo testified that she

did not recall the specifics as to what caused her to transfer $5,000 from Prime Financial's account

to Pupler's account.[9] (Okoroafo Dep. at. 90.)  She admitted that it was possible that she talked to

Scalici in connection with this transfer.  (*Id.* at 91.)  Bank One's records indicate that the $5,250

check that Bott requested Scalici to deposit on November 1st was deposited at 1:31 p.m.  The $5,000

transfer was processed at 1:39 p.m.  Bank One appears to concede that Bott did not personally

authorize Bank One to transfer $5,000 from Prime Financial to Pupler.  (Br. Opp'n Pl.'s Mot. Partial

Summ. J. at 19.)  Moreover, it concedes that the transfer of the $5,000 occurred pursuant to Scalici's

instructions to Okoroafo.  (*Id.* at 19-20.)  Bank One contends, however, that when Bott asked Scalici

to deposit a check for him, and Scalici agreed to do so, Scalici became Bott's agent.  Since Bott did

not contact the bank "to limit the scope" of Scalici's agency, Bank One argues, a question of fact

exists as to whether Bank One properly acted on the basis of Scalici's actual or apparent authority

when it debited Prime Financial's account in the amount of $5,000.

     "An agency relation exists only if there has been a manifestation by the principal to the agent

that the agent may act on his account, and consent by the agent so to act."  Restatement (Second) of

Agency § 15 (1957); *see also, Meretta v. Peach et al.,* 491 N.W.2d 278, 280, 195 Mich. App. 695,

697 (1992) (citing the Restatement (Second) of Agency).  "The relation which the law calls agency

does not depend upon the intent of the parties to create it . . . ."  Restatement (Second) of Agency

§ 1 cmt. b.  "Thus, when one who asks a friend to do a slight service for him, such as to return for

credit goods recently purchased from a store, neither one may have any realization that they are

---

[9] Moreover, Okoroafo does not testify that Bott gave her the authority, either in writing or orally, to permit
Scalici to transfer money out of his account into Pupler.

creating an agency relation . . . ." *Id.* Since Bott manifested to Scalici that Scalici could act on his behalf in depositing a check, and since Scalici consented to do so, an agency relation was created.

Even if there were an agency relation between Bott and Scalici, the issue then becomes whether Scalici had actual or apparent authority to transfer $5,000 from Prime Financial's account. The Restatement provides that an agent's "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* at § 26. There is no evidence that Bott expressly authorized Scalici to transfer $5,000 from Prime Financial's account into Pupler's account. Moreover, implied authority does not exist, for Scalici could not have reasonably interpreted Bott's request to deposit a check for Bott as granting him the authority to transfer money out of Prime Financial's account.

Similarly, Scalici did not have the apparent authority to transfer $5,000 from Prime Financial's account. The Restatement defines apparent authority as "the power to affect the legal relations of [a principal] by transactions with third persons, professedly as agent for the [principal], arising from . . . the [principal]'s manifestations to such third persons." *Id.* at § 8. "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* at § 27. The only manifestation that Bank One could arguably claim Bott (the principal) made to Bank One (the third party) is Bott's writing on the $5,250 check and deposit slip. Since Bott's signing of the check and filing out of the deposit slip could not have reasonably been interpreted by Bank One as granting Scalici the authority to withdraw money from Prime Financial's account, there was no apparent authority. Bank One's argument that a question of fact exists as to whether the bank properly acted

15

on the basis of Scalici's apparent authority because Bott never called the bank to limit the scope of Scalici's authority is without merit. For a principal to need to limit the authority (either actual or apparent) of his agent, such authority must exist in the first place. It is undisputed that Scalici did not have actual authority to transfer money from Prime Financial's account; and, since apparent authority did not exist, as it was unreasonable for the bank to believe that Scalici had the authority to withdraw money from Prime Financial's account based upon the manifestations (if any) from Bott to the bank, Bott did not need to call the bank to limit the authority Scalici never had.

Because no reasonable trier of fact could conclude that Scalici was authorized to transfer money from Prime Financial's account, the Court will grant Prime Financial's motion for summary judgment that the $5,000 transfer was unauthorized.

## E.    Bank One Defenses as to $630,000 Miscellaneous Charge

Bank One argues that, regardless of whether Bott authorized the $630,000 debit on October 18, 2002, it was entitled to debit Prime Financial's account because Prime Financial "had no right to [the] funds," pursuant to M.C.L. § 440.3113(1), which provides that although "[a]n instrument may be . . . postdated[,] . . . an instrument payable on demand is not payable before the date of the instrument." (Br. Opp'n Pl.'s Mot. Partial Summ. J. at 15.) Bank One's reliance on this statute is misplaced. This statute merely provides that, if a payee deposits a post-dated check with his bank (the depository bank), and the depository bank presents the check to the drawee for payment, then the drawee bank may choose not to pay it until the instrument becomes due. However, the drawee can pay the check before it becomes due. Section 440.4401(3) provides that "[a] bank may charge against the account of a customer a check that is otherwise properly payable from the account, even though payment was made before the date of the check, unless the customer has given notice to the bank of the postdating . . . ." Here, there is no evidence that Pupler (the drawer) gave Bank One (the

16

drawee) notice of the post-dating of this check.  Thus, the check was properly payable.  Not only was the check properly payable, but the statute relied upon by Bank One, § 440.3113(1), says nothing about whether, once a bank has credited a customer's account upon the payment of a check, it may then reverse that credit, as it did here.

Bank One also argues that, regardless of whether Bott authorized the transfer on October 18, 2002, it was entitled to debit Prime Financial's account pursuant to M.C.L. § 440.3418(2), which provides that "if an instrument has been paid . . . by mistake[,] . . . the person paying . . . may, to the extent permitted by the law governing mistake and restitution, . . . recover the payment from the person to whom or for whose benefit payment was made."  As in its reliance upon § 440.3113(1), Bank One's reliance upon § 440.3418(2) is similarly misplaced.  Bank One cannot assert that it was a "mistake" to pay the post-dated check deposited October 17th because it was entitled to pay that check pursuant to § 440.4401(3), as there was no stop order.  Rather, § 440.3418 is applicable when, for instance, a bank pays a draft on the mistaken belief that 1) a stop order had not been issued, 2) that the signature of the drawer was authorized, or 3) that the drawer had sufficient funds in his account to cover the draft.  *See* M.C.L. § 440.3418 cmt. 1, 3.  Moreover, even if Bank One's payment of the check deposited 10/17 could be characterized as a "mistake," Bank One still would not have been entitled to "recover payment from the person to whom or for whose benefit payment was made" because § 440.3418(3) provides that the remedy provided in § 440.3418(2) "may not be asserted against a person who took the instrument in good faith and for value."  Bott took this instrument in good-faith, not knowing of any defenses to it, and for value, as he loaned $600,000 to Prime Financial in exchange for this instrument.

Next, Bank One argues that the Account Agreement between Prime Financial and Bank One establishes that Bott never had the right to the $630,000 deposit.  The language in the Account

Agreement that Bank One asserts supports its position is as follows: "You agree not to . . . present [post-dated items] for deposit to your Account.  Also, the Bank . . . shall . . . have [no] liability for accepting for deposit [post-dated items] . . . ."  (Def.'s App. Opp'n Pl.'s Mot. Summ. J. Ex. G.) Bank One's reliance upon this language does not support its position that it was entitled to debit Prime Financial's account.  Even if Bott were not entitled to present a post-dated item for deposit, that would not permit Bank One to debit Prime Financial's account once it chose to credit it. Although the language of the agreement provides that the Bank shall have no liability for accepting for deposit post-dated items, it is unclear what liability the Bank may have for accepting for deposit a post-dated item.  When Bott deposited the check with Bank One, the relationship between him and Bank One was that of a payee and a depository bank.  Once a payee deposits a check with his depository bank, that bank then presents the check to the drawee for payment.  It is the drawee's decision to pay or not to pay a post-dated item.  If there is a stop-order on a post-dated item, and if a drawee pays an item over the stop-order, then the drawee would need to reimburse the drawer.  At that point, the drawee could, in some circumstances, attempt to recover from the person to whom payment was made.  Thus, a bank, as a depository bank, is not exposed to liability when a payee deposits a post-dated check.  The liability that Bank One is exposed to here is not due to the fact that a post-dated check was deposited for payment, or that it chose (as drawee) to pay that check, but rather is due to the fact that, after it paid the check, it then debited Bott's account allegedly without authorization.

Next, Bank One argues that even if Prime Financial could show that the $630,000 debit was unauthorized, the doctrine of ratification bars recovery.  (Br. Opp'n Pl.'s Mot. Partial Summ. J. at 17.)  "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act . . . is given effect as if originally

authorized by him."  Restatement (Second) of Agency § 82; *see Cudahy Bros. Co. v. W. MI. Dock & Market Corp.*, 285 Mich. 18, 25, 280 N.W. 93, 95 (1938) (same).  "Conduct which is justifiable only if there is ratification constitutes an affirmance . . . .  Thus, there is ratification if the purported principal with knowledge of the facts receives or retains property to which he is entitled only if the earlier transaction is validated."  Restatement (Second) of Agency § 83 cmt. c.  Bank One maintains that Bott ratified the October 18th transfer when he accepted a promissory note on October 21st from Scalici, promising to pay Bott the $630,000 principal of the loan made on October 18th through the transfer of funds from Prime Financial to Pupler, plus a $31,500 financing fee, on or before November 7th.

Prime Financial argues that the doctrine of ratification is inapplicable to cases arising under Article 4A of the UCC.  In support of this position, it cites the Comment to § 440.4602, which provides as follows:

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. . . .
>
> Fund transfers involve competing interests . . . [and t]hese competing interests were . . . thoroughly considered.  The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article.  Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties, and liabilities inconsistent with those stated in this Article.

Since § 440.4704, which provides that a bank must refund a payment order that is not authorized by its customer, covers the situation between the parties here, Prime Financial maintains, Article 4A must provide "the exclusive means of determining the rights, duties, and liabilities of the" parties in this case.

The Court disagrees with Prime Financial's position that the doctrine of ratification is inapplicable to this case.  The Comment to § 440.4602 provides that "resort to principles of law or

equity outside of Article 4A is not appropriate to create rights, duties, and liabilities *inconsistent* with those stated in the Article." (emphasis added); *see Regions Bank v. The Provident Bank, Inc.,* 345 F.3d 1267, 1275 (11th Cir. 2003) (holding that since Article 4A was silent with regard to claims based on a theory that a beneficiary bank accepted funds that it knew were fraudulently obtained, a provision of state law that requires a beneficiary bank to disgorge funds it knew were obtained fraudulently was not inconsistent with the goals or provisions of Article 4A); *Hedged Inv. Partners, L.P., v. Norwest Bank Minnesota*, 578 N.W.2d 765, 771 (Minn. 1998) (holding that contractual provisions between parties were applicable as they did not "create rights, duties, or liabilities inconsistent with Article 4A, but in addition to it"). The doctrine of ratification is not inconsistent with Article 4A. Article 4A provides that "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it *under the law of agency*." M.C.L. § 440.4702 (emphasis added). The doctrine of ratification is a principle of agency law. It is appropriate to apply the doctrine here for the purpose of determining whether Bott can be held to have ratified the October 18th $630,000 debit, and, therefore, under the law of agency, be held to have authorized the transaction.

Although Article 4A does not preclude Bank One from arguing that Bott ratified the $630,000 transfer, Bank One is not entitled to summary judgment on Prime Financial's claim that the $630,000 transfer was unauthorized since a genuine issue of material fact exists as to whether Bott ratified it. Bank One maintains that Bott ratified the October 18th $630,000 debit when Bott accepted a promissory note from Scalici promising to pay him $630,000 in principal plus a $31,500 financing fee by November 7th. The principal for the loan evidenced by this promissory note, Bank One asserts, was the $630,000 transferred from Prime Financial to Pupler on October 18th. Therefore, Bank One concludes, Bott ratified the October 18th $630,000 debit because his accepting of the promissory note on October 21 is only justifiable if he elected to affirm the October 18th

transfer.  Bott testified, however, that he did not receive the October 21st promissory note from Scalici until after Pupler's account was frozen in November, not on October 21st.  Therefore, he asserts, he did not ratify the October 18th $630,000 debit.  Whether Bott ratified the October 18th transaction, ultimately, is a question for the jury.

Finally, Bank One maintains that Prime Financial's claim to recover the $630,000 debited from its account is barred by the wrongful conduct rule.  The wrongful conduct rule prohibits a plaintiff from prosecuting an action "if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party."  *Orzel v. Scott Drug Co.*, 449 Mich. 550, 558, 537 N.W.2d 208, 212 (1995) (quoting 1A C.J.S. *Actions* § 29).  There are two limitations to the application of the wrongful conduct rule.  First, "the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute."  *Orzel*, 449 Mich. at 561, 537 N.W.2d at 214.  Second, "a sufficient casual nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages."  *Id*. at 564, 537 N.W.2d at 215.  Bank One argues that the wrongful conduct rule precludes Prime Financial from recovering the $630,000 transferred to Pupler on October 18th because the $630,000 at issue were the proceeds of a promissory note, dated October 7, 2002, that charged 130.35 percent annual interest, in violation of Michigan's criminal usury law, which prohibits the charging of interest at a rate exceeding 25 percent per annum.  *See* M.C.L. § 438.41.

The wrongful conduct rule does not preclude Prime Financial from recovering the $630,000 debited from its account for two reasons.  First, there is not a sufficient casual nexus between Prime Financial's usurious loan and Bank One's allegedly unilateral debiting of Prime Financial's account.  The Michigan Supreme Court explained the wrongful conduct rule's causation element as follows:

> The maintenance of an action, under the [wrongful conduct] rule, may be refused or precluded only where the illegality or immorality with which plaintiff is chargeable has a causative connection with the particular transaction out of which the alleged cause of action asserted arose.

The fact that a person has been guilty of a wrong in one particular does not make him an outlaw or forfeit his right to legal protection and relief in regards to others . . . .

An action may be maintained where the illegal or immoral act or transaction to which plaintiff is a party is merely incidentally or collaterally connected with the cause of action, and plaintiff can establish his cause of action without showing or having to rely upon such act or transaction although the act or transaction may be important as explanatory of other facts in the case.

*Orzel*, 449 Mich. at 564, 537 N.W.2d at 215 (quoting 1A C.J.S. *Actions* § 30).  To put it simply, "absent a showing that the plaintiff's illegal conduct was a proximate cause of the plaintiff's injuries, the wrongful-conduct rule . . . [does] not apply to bar . . . [the] plaintiff's claim."  *Id*. at 565, 537 N.W.2d at 215.  In this case, the usurious loan Prime Financial made to Pupler is only collaterally connected with Prime Financial's cause of action, as Prime Financial can establish its cause of action without having to rely upon the usurious loan.  Prime Financial's cause of action does not depend upon the underlying basis for why Prime Financial received a check from Pupler in the amount of $630,000.  Rather, Prime Financial simply has to show that Bank One transferred money from its account without its authorization.

The Michigan Court of Appeals cases cited by Bank One in support of its position that the wrongful conduct rule prevents Prime Financial from recovering the $630,000 debit are inapposite. *See Scalici v. Bank One, N.A. et al.,* No. 254632 - 254634, 2005 WL 2291732 (Mich. Ct. App. Sept. 20, 2005); *Wellman v. Bank One, N.A. et al.,* No. 253996, 2005 WL 2291741 (Mich. Ct. App. Sept. 20, 2005).  In these cases, plaintiffs claimed that Bank One should be liable for the losses they suffered as a result of investing in Pupler because they would not have invested in Pupler had it not been for the misrepresentations of Bank One employees.  The plaintiffs in these cases brought suit after they were unable to collect on their promissory notes from Pupler.  The Michigan Court of Appeals precluded plaintiff's recovery, holding that, since plaintiffs' claims were based on losses sustained after their criminally usurious loans became uncollectible, the claims were unenforceable under the wrongful conduct rule.  In the case here, Prime Financial's damages are not the result of

22

it being unable to collect on notes from Pupler, but rather are a result of Bank One's allegedly unilateral decision to transfer money out of its account.

The wrongful conduct rule also does not preclude Prime Financial from recovering the $630,000 debited from its account because of the statutory exception to the wrongful conduct rule. Where a "statute that the plaintiff alleges the defendant violated allows the plaintiff to recover for injuries suffered because of the violation," the wrongful conduct rule does not apply, "and the courts will simply permit the plaintiff to pursue his cause of action." *Orzel*, 449 Mich. at 570, 537 N.W.2d at 218. In this case, Prime Financial's cause of action is based upon M.C.L. § 440.4704, which permits a plaintiff to recover any payment of a payment order that the plaintiff did not authorize.

## III. Conclusion

Because a genuine issue of material fact exists as to whether Prime Financial authorized the October 18th $630,000 transfer to Pupler, the Court will deny Prime Financial's motion for summary judgment on this claim. The Court will grant Prime Financial's motion for summary judgment on its claim that $5,000 was transferred from its account to Pupler on November 1, 2002, without its authorization, however, because no reasonable trier of fact could conclude that Paolo Scalici had the authority to transfer money from Prime Financial's account.

An Order consistent with this Opinion will be entered.

Dated: February 14, 2006                                    _____/s/ Gordon J. Quist_____
                                                            GORDON J. QUIST
                                                            UNITED STATES DISTRICT JUDGE